UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 13-20639-CIV-ALTONAGA/SIMONTON

ROVIN SINGH individually, and as parent
and legal guardian of J.S., V.S., Jy.S.,
and Ve.S. (minors),
Plaintiffs,

v.

CARIBBEAN AIRLINES LIMITED,
Defendant.
_____/

## PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CHOICE OF LAW, CARIBBEAN AIRLINES LIMITED'S DEFENSE OF COMPARATIVE NEGLIGENCE AND LIABILITY FOR SUBSEQUENT MEDICAL MALPRACTICE

The Plaintiffs, ROVIN SINGH ("SINGH") individually, and as parent and legal guardian of J.S., V.S., Jy.S., and Ve.S. pursuant to Federal Rule of Civil Procedure Rule 56, hereby move for the entry of Partial Summary Judgment against the Defendant, CARIBBEAN AIRLINES LIMITED ("CAL") as to choice of law, its defense of comparative negligence, and its liability for subsequent medical malpractice, and state as follows in support thereof:

1. The deadline for factual discovery in this case is January 6, 2013. At the time this Motion was filed the parties have exchanged all initial expert witness and rebuttal reports, and CAL has received reports from and deposed all of the Plaintiffs' retained experts.

**Plaintiffs' Statement of Uncontested Facts**

2. This is an action brought under Article 17 of the Convention for the Unification of Certain Rules for International Carriage by Air — Montreal, (the "Montreal Convention").

3. At all times material to this action, Plaintiff, Rovin Singh, ("SINGH") was a resident of and domiciled in the State of Florida. **See Exhibit 1 – Singh's Florida Identification Card**.

4. On or about December 5, 2011, the SINGH a resident of Florida purchased a round trip ticket from CAL, for travel from Miami, Florida to Port of Spain Trinidad, returning from Port of Spain Trinidad on December 15, 2011. **See Exhibit 2 – Itinerary and Flight Receipt for CAL Flight BW 484, and Boarding Pass.**

5. The round trip ticket for travel was purchased by SINGH a resident of Florida, in Florida. **See Exhibit 2.**

6. SINGH is the parent and legal guardian of his minor children J.S., V.S., Jy.S., and Ve.S. **See Exhibit 3 – Marital Settlement and Parenting Agreement**.

7. The events which give rise to SINGH's cause of action occurred on board CAL flight BW 484 while it was en route from Port of Spain, Trinidad to Miami, Florida. [DE 8, 38].

8. The total duration of the flight was approximately three hours and thirty four minutes. **See Exhibit 4 – CAL's Answer to Interrogatory No. 4.**

9. Approximately one hour into the flight, SINGH suffered a stroke. **See Exhibit 5 – Medaire Patch Summary; Exhibit 6 - Audio recording and transcript between Medaire and Flight BW 484; Exhibit 7 – Deposition of First Officer and CAL Corporate Representative Monique Nobrega. 74:11-20; 75:1-7; 70:4-22.**[1]

---

[1] Exhibits to the depositions of CAL personnel are attached as Exhibit 19.

10. Almost immediately SINGH'S condition was brought to the attention of flight attendant Doddy Bissoondath-Santiago, who pursuant to her first aid training diagnosed SINGH as suffering from a stroke and notified the purser (head flight attendant) Irina Blake who then informed Captain Shafeez Shageer and First Officer Monique Nobrega. **See Exhibit 8 – Deposition of CAL Corporate Representative and Flight Attendant Doddy Bissoondath-Santiago 29:16-25; 30:14-17; 32:2-6; Exhibit 9 – Deposition of CAL Corporate Representative and Purser Irina Blake 49:4-9.**

11. At this point flight BW 484 was near San Juan, Puerto Rico. **See Exhibit 10 – Deposition of Captain and CAL Corporate Representative Shafeez Shageer - 284:12-25; Exhibit 7 - Nobrega Dep. 102:7-25; 103-1-25**.

12. Both the captain and/or first officer of Flight BW 484 admitted that they could have diverted the flight earlier and had SINGH treated at the nearest hospital in San Juan, Puerto Rico. **See Exhibit 7 - Nobrega Dep. 102:7-25; 103-1-25; Exhibit 10 – Shageer Dep. 294:13-25; 295-296:1.**

13. CAL's corporate representatives and pilot admit that the aircraft should have diverted immediately to San Juan, Puerto Rico once it was clear that SINGH was suffering from a stroke, and that failure to do so at Medlink's request was a violation of CAL's policies and procedures. **See Exhibit 10 Id.; Exhibit 11 – Deposition of CAL Corporate Representative - Vilma Wharwood Dep. 54: 22-25; 55:1-9; 66:10-25: 67:1.**

14. However, after being advised by SINGH's sister, and Flight Attendant Santiago that SINGH was having a stroke, the Captain and First Officer waited between 60 to 90 minutes prior to contacting Medlink, CAL's in-flight medical emergency service which was available to them twenty four hours a day, seven days a week for the purpose of addressing in-flight medical emergencies. **See Exhibit 5; Exhibit 6; Exhibit 7 – Nobrega Dep. 70:9-25.**

15. Subsequent to diagnosing SINGH with a stroke, and without consulting with its Medlink physician, CAL administered nitroglycerin to SINGH despite the fact that this medication is contraindicated for individuals suffering from ischemic stroke, receiving tissue plasminogen activator, heparin, or suffering from increased intracranial pressure. **See Exhibit 8 - Bissoondath-Santiago Dep 35:3-25; 43:10-25; Exhibit 12 - CAL Incident Report by Irina Blake; Exhibit 14 - FDA Prescribing Information for Nitroglycerin.**

16. When the first officer finally contacted Medlink, Dr. Robb Leigh, the on call board certified emergency physician advised that the plane should divert to either San Juan Puerto Rico, or Nassau, Bahamas, due to the fact that the primary treatment for an ischemic stroke is immediate administration of tissue plasminogen activator (tPA) no later than three hours from onset of symptoms pursuant to the Food and Drug Administration (FDA) and manufacturer's instructions for administration of the medication.[2] **See Exhibit 5; Exhibit 6; Exhibit 14 – Deposition of Medaire Corporate Representative Robb Leigh, MD 58:18-25;59 - 62:18-25.**

17. Dr. Robb Leigh further testified that had Medlink been contacted 60 to 90 minutes prior, when SINGH's stroke was initially reported to CAL's flight crew, he would have made the same recommendation to divert. **See Exhibit 13 - Robb Leigh Dep Id.**

18. Pursuant to Dr. Leigh's recommendation to divert, the first officer set an alternate course to Nassau, Bahamas, but approximately 10-15 minutes after diverting to Nassau the captain inexplicably ordered the plane to divert back to Miami, Florida contrary to the recommendation of Dr. Robb Leigh. **See Exhibit 7 – Nobrega Dep. 78:7-25; 79-80:1-25.**

---

[2]Per FDA and manufacturer's recommendations Alteplase/tPA treatment should only be initiated within 3 hours after the onset of stroke symptoms, and after exclusion of intracranial hemorrhage by a cranial computerized tomography (CT) scan or other diagnostic imaging method sensitive for the presence of hemorrhage. *See Activase for Acute Ischemic Stroke*, http://www.activase.com/iscstroke (last visited Oct. 22, 2013).

19. The decision to proceed to Miami, Florida contrary to Dr. Leigh's recommendation was not communicated to Medlink, who had arranged for EMS to be standing by on the tarmac in Nassau, Bahamas, Medlink also could have (had they been informed) made alternate arrangements in Miami (or San Juan, Puerto Rico) and could have also communicated important details regarding SINGH's condition to EMS personnel and emergency physicians there. **See Exhibit 15 – Deposition of Medlink Communications Specialist Michelle Tyler 36:10-24.**

20. Once the aircraft landed at Miami International Airport, CAL failed to advise EMS personnel regarding the time of initial onset of the stroke and the fact that SINGH had been administered nitroglycerin. **See Exhibit 10 – Shageer Dep. 201:2-7; 205:10-25; Exhibit 9 – Blake Dep. 78:15-25; 81:11-15; Exhibit 7 – Nobrega Dep. 91:6-15**. As a result of CAL's actions SINGH was administered tPA at least fifty minutes to one hour outside of the FDA mandated three hour window.[3] **See Exhibit 16 – Patient Timeline Summary.**

21. In its Answer and Affirmative Defenses [DE 41], CAL has raised the comparative negligence of SINGH as its Second Affirmative Defense pursuant to Article 20 of the Montreal Convention.

22. CAL's corporate representative and head flight attendant Irina Blake admitted that during the flight SINGH himself did not engage in any actions which contributed to his injuries in any way. **See Exhibit 9 – Blake Dep. 93:16-25; 94:1-2.** CAL's expert witness Captain Robert Shore, has also testified

---

[3]Current studies have found that for <u>every 15 minutes</u> sooner tPA can be administered after onset of stroke symptoms, patients have a 4% greater odds of walking independently at discharge, a 3% greater odds of being discharged to home rather than an institution, a 4% lower odds of death before discharge, and a 4% lower odds of experiencing symptomatic hemorrhagic transformation of infarct. J.L. Saver, et al., *Time to treatment with intravenous tissue plasminogen activator and outcome from acute ischemic stroke.*, JAMA: the journal of the American Medical Association, Vol 309, No. 23, 2486 (2013), available at http://www.aahs.org/medstaff/wp-content/uploads/TPAaterStroke2013.pdf .

that Mr. Singh did not engage in any acts of negligence while on board Flight BW 484. **See Exhibit 17 – Deposition of CAL Expert Robert Shore at 143:21-25; 144:1-3.**

23. However, counsel for CAL has indicated in its answers to Plaintiffs' Affirmative Defense Interrogatories that it will attempt to introduce SINGH's past conduct and prior medical conditions, such as his alleged history of smoking and use of alcohol prior to the subject incident as evidence of comparative negligence. **See Exhibit 18 – CAL's Answers to Plaintiffs' Affirmative Defense Interrogatories.**

## Memorandum of Law

### A.     Legal Standard

24. In considering a motion for summary judgment, the district court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970).

25. The Court should not resolve factual disputes by weighing conflicting evidence. *Tippens v. Celotex Corp.*, 805 F. 2d 949, 953 (11th Cir. 1986). An order granting summary judgment may only be entered if the record indicates that there is no genuine dispute over the material facts, and the moving party is entitled to judgment as a matter of law. *Id.* at 952.

### B.     Liability Under the Montreal Convention

26. The rights of airline passengers on international flights are governed by the "Convention for International Carriage by Air," known as the Montreal Convention. S. Treaty Doc. No. 106-45, 1999 WL 33292734 (Treaty). *Nastych v. British Airways PLC,* 2010 WL 363400, 1 (S.D.N.Y. 2010). Article 17 of the Montreal Convention subjects carriers to strict liability for "damage sustained in case of death or bodily injury of a passenger upon condition only that the "accident" which caused the death or injury

took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Matveychuk v. Deutsche Lufthansa, AG* 2010 WL 3540921, 2 (E.D.N.Y. 2010); *see also, Atia v. Delta Airlines, Inc.*, 692 F.Supp.2d 693, 699 (E.D. Ky. 2010) (quoting Montreal Convention, Art. 17) ("[t]he Montreal Convention establishes a presumption of liability against air carriers for…the death or bodily injury of a passenger….provided the harm 'took place on board the aircraft or in the course of any of the operations of embarking or disembarking").

27.     "Once a carrier is found liable under the Montreal Convention, it is strictly liable for any damages up to a specified amount." *Schaefer-Condulmari v. US. Airways Group, Inc.*, 2009 WE 4729882, 5 (E.D.Pa.) (E.D.Pa. 2009). For liability for bodily injury or death, that amount is $100,000 in "Special Drawing Rights."1 MC Art. 21(1). *See also Pennington v. British Airways*, 275 F. Supp. 2d 601, 603 (E.D. Pa. 2003). ("Article 17 'subjects international carriers to strict liability for injuries sustained on flights connected with the United States.'") (quoting *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 552 (1991).

28.     Where an accident has occurred a carrier is strictly liable and can only avoid and/or limit damages for bodily injury or death in excess of the Special Drawing Rights if it can prove either 1) that the damage was not due to its or its agents' negligence or other wrongful acts or omissions, or 2) that the damage was "solely due" to the negligence or other wrongful acts or omissions of a third party,[4] or 3) the claimant was comparatively negligent, and this negligence either caused or contributed to his injuries. *Id.*

29.     "[A]n "accident" under Article 17 of the Montreal Convention is a flexible term that encompasses an 'assessment of all the circumstances surrounding a passenger's injuries.'" *Mansoor v. Air France KLM Airlines*, 2008 WL 4748166, 3 (S.D.Cal., 2008). The United States Supreme Court, has

---

[4] CAL withdrew this defense in response to Plaintiffs' Motion to Strike [DE 49].

indicated that failure to divert from a normal flight plan where time sensitive emergency medical care is required constitutes an "accident."[5]

**C. The Montreal Convention Permits a defense of comparative negligence, pursuant to the law of the forum state as determined by the State's conflict of law principles.**

30. The Montreal Convention became effective in the United States on November 4, 2003 and superseded the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note following 49 U.S.C.App. § 1502 (hereinafter "Warsaw Convention"). *See Ugaz v. Am. Airlines, Inc.*, 576 F. Supp. 2d 1354, 1360 (S.D. Fla. 2008).

31. Because the Montreal Convention only recently came into force, it is appropriate to rely on cases interpreting the Warsaw Convention. *See Ugaz,* 576 F. Supp. at 1360*; Baah v. Virgin Atl. Airways Ltd.*, 473 F. Supp. 2d 591, 596 (S.D.N.Y. 2007).

32. In the instant case, the substantive law of Florida is applicable where the Convention is silent. Subsequent to the United States Supreme Court's holding in *Zicherman v. Korean Airlines Co.*, 516 U.S. 217, 229 (1996), although the Montreal Convention governs the general framework of liability between the parties, the choice of law analysis is no different than it would be under the familiar *Erie* doctrine. *See Ins. Co. of N. Am. v. Fed. Exp. Corp.*, 189 F.3d 914, 920 (9th Cir. 1999)

---

[5]"Suppose that a passenger on a flight inexplicably collapses and stops breathing and that a medical doctor informs the flight crew that the passenger's life could be saved only if the plane lands within one hour. Suppose further that it is industry standard and airline policy to divert a flight to the nearest airport when a passenger otherwise faces imminent death. If the plane is within 30 minutes of a suitable airport, but the crew chooses to continue its cross-country flight, [t]he notion that this is not an unusual event is staggering." *Olympic Airways v. Husain,* 540 U.S. 644, 656, 124 S.Ct. 1221, 157 L.Ed.2d 1146 (2004) (followed in *Cardoza v. Spirit Airlines, Inc.*, 10-61668-CIV, 2011 WL 2447523 (S.D. Fla. 2011)).

(*Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1029 (2d Cir. 1996).[6] "This is so because the Supreme Court has "admonished lower courts to refrain from developing federal common law "under cover of advancing the goal of uniformity," in cases arising out of the Warsaw and Montreal Convention. *See Brink's Ltd.*, 93 F.3d at 1029.

33. Consequently, although the Montreal Convention provides the general rule of liability, the manner in which concepts such as comparative negligence and wilful misconduct are to be applied to a particular case are governed by *Erie* and the conflicts of laws principles of the forum state. *See Ins. Co. of N. Am. v. Fed. Exp. Corp.*, 189 F.3d at 920 ("Convention neither adopted any uniform rule of its own nor authorized national courts to pursue uniformity in derogation of otherwise applicable law."); *see also Prescod v. AMR, Inc.*, 383 F.3d 861, 870 n.11 (9th Cir. 2004) (on remand, state law principles of comparative negligence would apply to defense of contributory negligence in claim brought pursuant to Warsaw Convention); *Husain v. Olympic Airways*, 116 F. Supp. 2d 1121, 1141 (N.D. Cal. 2000) (state law comparative negligence principles applied to Warsaw Convention claim); *D'Alessandro v. Am. Airlines, Inc.*, 139 F. Supp. 2d 305, 308 (E.D.N.Y. 2001) (term "wilful misconduct" contained in the Warsaw Convention was to be interpreted pursuant to state law).

---

[6]Because the Montreal Convention only recently came into force, it is appropriate to rely on cases interpreting the Warsaw Convention. *See, Ugaz v. Am. Airlines, Inc.*, 576 F. Supp. 2d 1354, 1360 (S.D. Fla. 2008)*; Baah v. Virgin Atl. Airways Ltd.*, 473 F. Supp. 2d 591, 596 (S.D.N.Y. 2007).

34. The fact that CAL has also raised the Foreign Sovereign Immunities Act[7] as Grounds for federal jurisdiction does not alter this outcome, as state law generally controls in FSIA cases as well.[8] *Brink's Ltd. v. S. African Airways*, 93 F.3d at 1030; *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959 (2d Cir.1991). More specifically, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *Brink's Ltd. v. S. African Airways*, 93 F.3d at 1030 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2597-98 n. 11, 77 L.Ed.2d 46 (1983)).

**D.   Florida's choice of law analysis requires that where applicable, Florida law should govern in the instant lawsuit.**

35. Florida has adopted the "significant relationships test" as set forth in the Restatement (Second) of Conflict of Laws ss 145-146 (1971). *See Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). Application of this test to the facts of the instant case dictates that Florida law should control where the terms of the Montreal Convention are silent or unclear.

36. In *Proprietors Ins. Co. v. Valsecchi*, 435 So. 2d 290, 295 (Fla. 3d DCA 1983), Florida's Third District Court of Appeals, applying the significant relationships test, held that Florida law controlled notwithstanding the fact that the plane crash that was the subject of the plaintiffs' lawsuit occurred in North Carolina.

37. The Third District Court of Appeals identified the following factors which supported the applicability of Florida law;

---

[7] Plaintiffs contend that CAL is not entitled to protection under FSIA.

[8] This Court should also note that during the hearing on Plaintiffs' Motion to Amend, CAL conceded to the applicability of Florida law as it relates to the derivative claims of SINGH's children pursuant to Florida Statute § 768.0415 (Liability for Injury to Parent).

> a. the decedents resided in Florida;
>
> b. the flight began and was to end in Florida;
>
> c. the lawsuits were filed in Florida;
>
> d. the relationship between the parties arose in Florida;
>
> e. the location where the tickets were purchased.

*See Valsecchi*, 435 So. 2d at 296-297.

38. Analysis of these factors in the instant case requires the application of Florida law. Here it is undisputed that 1) at the time of the events giving rise to this cause of action and subsequently, SINGH was a legal resident of the United States, residing in and domiciled in Florida, 2) the round trip ticket purchased from CAL was for travel to and from Miami, Florida, 3) the instant lawsuit was filed in Florida, 4) the plane tickets were purchased in Florida and therefore it is the state where the relationships between the parties initially arose.

39. In addition to these factors, the injuries giving rise to this action occurred while SINGH was en route to Miami, Florida and subsequent to his admission to a hospital in Miami, Florida. Moreover, SINGH'S injuries were further exacerbated by CAL's decision to override the recommendations of Medlink and transport him to a hospital in Miami, Florida, over hospitals in Nassau, Bahamas or San Juan, Puerto Rico. Therefore the location of SINGH's injury can also be said to be Florida as a direct result of CAL's own decision to refuse to divert the aircraft contrary to CAL's own protocol and Medlink's recommendation.  Therefore, Florida's substantive law applies where the Montreal Convention is silent.

E. **Under Florida law, conduct which may have contributed to an illness or medical condition, which furnishes the occasion for medical treatment, cannot form the basis of a defense to liability.**

40. As CAL has admitted that during the subject flight, SINGH did not engage in any acts which constituted comparative negligence on his part, the only conceivable theory under which CAL could

attribute any negligence to him would be on the basis of conduct which may have contributed to his illness or medical condition which furnished the occasion for medical treatment. However, it is well settled that under Florida law such conduct cannot serve as a defense in cases such as the instant case involving negligent medical care/medical malpractice. *See In re Standard Jury Instructions In Civil Cases-Report No. 09-01 (Reorganization of the Civil Jury Instructions)*, 35 So. 3d 666 (Fla. 2010) (note for use on comparative negligence jury instruction 402.14b**,** "[c]onduct on a patient's part prior to seeking treatment, which furnishes the need for medical treatment, is not a defense to malpractice in the treatment").

41.     In Florida, this doctrine is not limited to hospitals and medical providers, and applies to anyone who (like CAL), assumed and/or owed a duty to provide medical care to the plaintiff. *See e.g. Riedel v. Sheraton Bal Harbour Assoc.*, 806 So. 2d 530, 532 (Fla. 3d DCA 2001) (although hotel initially had no obligation to provide the plaintiff with medical assistance, once it undertook this task, it had a duty to exercise reasonable care); *see also Husain v. Olympic Airways*, 116 F. Supp. 2d at 1143 (N.D. Cal. 2000) (citing *Williams v. Trans World Airlines*, 509 F.2d 942, 946 n. 8 (2d Cir.1975)) ("[it] has generally been held that commercial air lines owe their passengers the duty of utmost care for their safety.")).

42.     In *Riedel*, the defendant emphasized the plaintiff's failure to take her insulin or monitor her blood sugar as the major cause of her death during trial. *See Id*. at 533.  However, the Third District Court of Appeals held that plaintiff's failure to take insulin or check her blood sugar level could not have been a legal cause of her death, because any negligence on her part which occurred prior to her being treated by the defendant simply provided the occasion for its negligent acts. *Id.* at 534.  Accordingly, the Third District remanded the case for a new trial and ordered that the defendant be prohibited from arguing that the plaintiff was comparatively negligent by creating the situation which led to her requiring medical treatment. *See Id.* Here CAL's own expert admitted that CAL owed Mr. Singh a duty to provide medical care, and to provide that care in a reasonable manner. **See Exhibit 18 - Shore Dep. at 84:18-25; 85:1-21.**

43. Thus, the fact that SINGH may have smoked, drank, or had any preexisting medical condition prior to suffering a stroke while a passenger in CAL's care cannot form the basis of a defense of comparative negligence against him under Florida law, where SINGH's allegations of negligence against CAL arise out of the Defendant's misdiagnosis, delay in treatment, negligent administration of contraindicated medication, failure to divert the aircraft, and generally negligent medical care. *See also Matthews v. Williford*, 318 So. 2d 480, 483 (Fla. 2d DCA 1975) (fact that plaintiff smoked and remained overweight contrary to physician's instructions prior to admission to hospital not available as a defense to malpractice action); *Vendola v. Southern Bell Telephone & Telegraph Co.,* 474 So.2d 275 (Fla. 4th DCA 1985) (plaintiff's suicide attempt was merely pre-existing condition and therefore not a legal cause of damage in negligence action against phone company for failure to respond to request for ambulance); *Whitehead v. Linkous*, 404 So. 2d 377 (Fla. 1st DCA 1981) (conduct on patient's part before he entered hospital in consuming overdose of drugs, which may have contributed to his illness or medical condition, which furnished the occasion for medical treatment, was not available as defense to malpractice).

44. CAL's reliance on the Fourth District Court of Appeals' holding in *Healthsouth Sports Med. & Rehab. Ctr. of Boca Raton, Inc. v. Roark*, 723 So. 2d 314, 315 (Fla. 4th DCA 1998) for the proposition that failure to follow a physician's orders is evidence of comparative negligence is misplaced for two reasons. First, *Healthsouth* specifically distinguished its holding from *Williford* and its progeny in that the conduct the defendants were attempting to raise as comparative negligence in *Williford* had occurred prior to the medical condition which led to the alleged negligent medical treatment, not subsequent to the injury. Second, although Plaintiffs concede that under *Healthsouth* CAL could arguably raise SINGH's alleged *post-injury* failure to follow the instructions of his physicians as comparative negligence, CAL has failed to disclose any evidence in its responses to discovery or expert opinion establishing how any such alleged failure would have contributed to or exacerbated SINGH's damages.

Even assuming *arguendo* that CAL was permitted to raise this conduct as a defense, CAL has failed to disclose any expert opinion or other evidence establishing how SINGH's alleged smoking and drinking or any other preexisting conditions would have contributed to or exacerbated his damages.

**F.     Under Florida law, CAL is liable for any and all subsequent malpractice occasioned by its negligence.**

45.     Florida law requires that CAL bear the sole responsibility for any and all subsequent acts of medical malpractice resulting from its negligent actions. As the Florida Supreme Court first announced in *Stuart v. Hertz Corp.*, 351 So. 2d 703, 707 (Fla. 1977):

> "Where one who has suffered personal injuries by reason of the negligence of another exercises reasonable care in securing the services of a competent physician or surgeon, and in following his advice and instructions, and his injuries are thereafter aggravated or increased by the negligence, mistake, or lack of skill of such physician or surgeon, the law regards the negligence of the wrongdoer in causing the original injury as the proximate cause of the damages flowing from the subsequent negligent or unskillful treatment thereof, and holds him liable therefor.

CAL is also prohibited from joining any medical provider it contends is liable for the Plaintiff's injuries pursuant to theories of indemnity or contribution. *See Id.* at 706.

46.     Furthermore, as it relates to any evidence CAL may attempt to proffer at trial, the Florida Supreme Court's ruling in *Stuart* prohibits CAL from proffering or eliciting any medical testimony or making any argument that the Plaintiff's subsequent medical care and treatment (or allegedly unnecessary treatment) was the sole or substantial factor in causing his injury.[9] *See Pedro v. Baber*, 83 So. 3d 912, 915 (Fla. 2d DCA 2012) (*Stuart* instruction should have been given where expert testified surgery was unnecessary); *Dungan v. Ford*, 632 So. 2d 159, 164 (Fla. 1st DCA 1994) ("[w]e are of the view that the testimony of [the medical expert] clearly focused upon [the treating doctor's] lack of skill or judgment, and upon the poor results achieved by his treatment. . . admission of this testimony, coupled with the

---

[9] It should be noted that there has been no evidence and/or expert opinion proffered by either side alleging or opining that Mr. Singh's condition and injuries were occasioned by medical malpractice.

denial of the special instruction informing the jury as to how to deal with this aspect of the case, was reversible error.").

WHEREFORE, the Plaintiffs request that the Court enter an order

1) Finding that Florida law applies to the instant action where not explicitly governed by the terms of the Montreal Convention.

2) Granting summary judgment in favor of Plaintiffs on CAL's defense of comparative negligence, or in the alternative finding that CAL's defense of comparative negligence is limited to any alleged post-injury failure to follow physician's instructions.

3) Finding that if CAL is found liable to SINGH, it shall also be liable for any subsequent alleged malpractice which occurred after it initially provided medical care and treatment to SINGH.

Respectfully Submitted,

By: s/Christopher Wadsworth_____
   **Christopher W. Wadsworth**
   Florida Bar No. 78025
   cw@wadsworth-law.com
   Raymond R. Dieppa
   Florida Bar No. 27690
   rrd@wadsworth-law.com
   WADSWORTH HUOTT, LLP
   14 NE 1ST Avenue, 10th Floor
   Miami, Florida 33132
   Telephone: 305-777-1000
   Facsimile: 305-777-1001
   *Attorneys for Plaintiffs*

## LOCAL RULE 7.1 CERTIFICATION

  Counsel for Plaintiffs hereby certifies that he has conferred with all parties who may be affected by the relief sought in this Motion in a good faith effort to resolve the issues raised in the Motion.

/s/ Christopher W. Wadsworth

Attorney

## CERTIFICATE OF SERVICE

  I hereby certify that on January 4, 2014, the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified.

By:_____/s/_____

Christopher W. Wadsworth

## SERVICE LIST

Robert C. Owens
Florida Bar No. 273988
bobowens@avlaw.com
ROBERT C. OWENS, P.A.
18890 SW 264th St.
Miami (Homestead), Florida 33031
Telephone: 305-245-6813
Facsimile: 305-245-6403

-and-

John Maggio (pro hac vice)
jmaggio@condonlaw.com
CONDON & FORSYTH LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: 212-490-9100
Facsimile: 212-370-4453

*Attorneys For Defendant Caribbean Airlines Limited*